**MENTOR GRAPHICS CORPORATION and Meta Systems, Inc., Plaintiffs–Appellants,**

v.

**QUICKTURN DESIGN SYSTEMS, INC., Defendant–Appellee.**

No. 97–1564.

United States Court of Appeals, Federal Circuit.

Aug. 5, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 28, 1998.

David A. York, Latham & Watkins, Menlo Park, California, argued for plaintiffs–appellants. With him on the brief was Sanjay Bhandari.

James W. Geriak, James C. Brooks, Lyon & Lyon LLP, Costa Mesa, California, argued for defendant–appellee. With him on the brief were Steven D. Hemminger, Lawrence R. LaPorte, and Jonathan T. Losk. Of counsel on the brief was Alan T. McCollom, Marger Johnson McCollom & Stolowitz, P.C., Portland, Oregon.

Before MAYER, Chief Judge, RADER, and BRYSON, Circuit Judges.

RADER, Circuit Judge.

Mentor Graphics Corp. (Mentor) and Meta Systems, Inc. (Meta) sued Quickturn Design Systems, Inc. (Quickturn) for a declaratory judgment of invalidity and non-infringement of U.S. Patent No. 5,036,473 (the '473 patent). In a counterclaim, Quickturn alleged infringement. The United States District Court for the District of Oregon preliminarily enjoined Mentor and Meta from infringing the '473 patent. Because the doctrine of assignor estoppel barred both Mentor and Meta from challenging the validity of the '473 patent, this court affirms.

I

Quickturn, Mentor, and Meta manufacture and sell hardware emulation technology. This technology allows engineers to simulate and test new circuit designs before constructing the actual circuits. On October 5, 1988, Michael R. Butts filed a patent application for a "reconfigurable hardware implementa-

tion system." On October 4, 1989, Butts filed a continuation-in-part of his 1988 application, naming Jon A. Batcheller as an additional inventor. Batcheller and Butts assigned their rights to this application, which eventually issued as the '473 patent, to their employer, Mentor. The '473 patent issued on July 30, 1991.

On February 28, 1992, Quickturn purchased some of Mentor's hardware emulation assets, including the '473 patent, six other pending patent applications, and related hardware and software. Quickturn paid Mentor $200,000 cash and gave Mentor a combination of Quickturn stock and warrants for additional Quickturn stock. The sales agreement included the following language:

> 3.2 *Warranty Disclaimer.* Except as set forth in Section 7.1, Seller transfers the Technology without any warranty or representation and on an "AS IS, WHERE IS" basis. Both parties acknowledge that Purchaser is an expert and the recognized industry leader in the field of emulation technology. SELLER EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR THAT THE TECHNOLOGY OR THE OTHER ASSETS ARE OF ANY CERTAIN QUALITY, WILL PERFORM IN ANY PARTICULAR MANNER OR PRODUCE ANY PARTICULAR RESULTS, OR THAT THE TECHNOLOGY OR THE OTHER ASSETS ARE SUITABLE OR ADEQUATE FOR THE PURCHASER'S REQUIREMENTS. Seller also disclaims any warranty as to the validity or enforceability of the patent and patent applications assigned to Purchaser under this Agreement.

Fulfilling this sales agreement, Mentor assigned the '473 patent to Quickturn on March 2, 1992. Under terms of the sale, Batcheller and Butts became Quickturn employees.

The '473 patent was not, however, Quickturn's only patent protecting its hardware emulation technology. In 1988, a group of Quickturn employees had filed their own patent application, claiming technology similar to that developed by Batcheller and Butts. The inventors assigned their application to Quickturn. The '473 patent issued during the prosecution of this application. At that point, the Quickturn inventors filed an affidavit claiming a conception date before the filing date of the '473 patent. The Patent and Trademark Office did not declare an interference proceeding. Quickturn's application issued as U.S. Patent No. 5,109,353 (the '353 patent) on April 28, 1992.

After Mentor assigned the '473 patent to Quickturn, Quickturn set about resolving the apparent priority conflict between the '473 and '353 patents. After an internal evaluation of the evidence, Quickturn dedicated claims 1, 6, 13, 14, 16, and 17 of the '473 patent to the public. Quickturn took this action because it believed that the inventors of the '353 patent first invented the subject matter of these claims.

Meanwhile, Meta, a small French company, had been developing hardware emulation technology independent of either Mentor or Quickturn. By 1993, Meta delivered its initial product to the French Ministry of Defense. In March 1994, Meta introduced the first in a series of commercial products (collectively referred to as the SimExpress systems). Due to its difficulty in acquiring venture capital, Meta decided to sell itself to a more established company to finance its growth. Both Quickturn and Mentor offered to purchase Meta, but the French Government would only approve a sale to Mentor.

On May 19, 1995, Mentor and Meta entered a share purchase agreement whereby Mentor purchased all shares of stock issued by Meta. The sale was completed in May 1996. Meta is now a wholly owned subsidiary of Mentor, with operations in France. Mentor has budgetary control over Meta. Some personnel work for both companies. Mentor markets and distributes Meta's products.

Believing that Meta's products infringe its patents, Quickturn moved to assert its right to exclude. On January 25, 1996, Quickturn asked the International Trade Commission to prevent importation of the SimExpress sys-

tems under 19 U.S.C. § 1337. Quickturn's petition remains pending before the Commission.

In October 1995, Mentor sued Quickturn in the United States District Court for the Northern District of California. Mentor sought a declaratory judgment of invalidity and noninfringement of several U.S. patents, including the '473 patent. Mentor later dismissed the California suit in favor of this suit. On March 5, 1996, Mentor filed the present action, which seeks a similar declaration, in the District of Oregon. Quickturn filed a counterclaim accusing several SimExpress products of infringing the U.S. patents at issue. On July 3, 1996, Quickturn moved for partial summary judgment, seeking to prevent Mentor and Meta from challenging the validity of its patents. On December 20, 1996, the district court granted Quickturn's motion with respect to the '473 patent. The court based its ruling on the doctrine of assignor estoppel.

On June 5, 1997, Quickturn moved for a preliminary injunction to prevent Mentor and Meta from making, using, selling, offering to sell, and either importing into or exporting from the United States a variety of the accused products or their components. Quickturn alleges that these products infringe claims 7 and 8 of the '473 patent. The district court granted the injunction. Mentor and Meta now appeal. This court has jurisdiction over the appeal under 28 U.S.C. § 1292(c)(1).

## II

■■■■ A preliminary injunction requires the assessment of four factors: the likelihood of movant's success on the merits, the irreparability of harm to the movant without an injunction, the balance of hardships between the parties, and the demands of the public interest. *See Hybritech Inc. v. Abbott Lab.,* 849 F.2d 1446, 1451, 7 USPQ2d 1191, 1195 (Fed.Cir.1988). This court reviews the grant of a preliminary injunction for abuse of discretion. *See id.* at 1449. A district court abuses its discretion by making a clear error of judgment in weighing relevant factors or in basing its decision on an error of law or on clearly erroneous factual findings. *See A.C.*

*Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1039, 22 USPQ2d 1321, 1333 (Fed.Cir.1992).

On appeal, Mentor and Meta argue that the district court abused its discretion by incorrectly determining that Quickturn would likely show infringement of the '473 patent. In particular, they argue that Quickturn did not show a likelihood of success in defending the validity of the '473 patent. The district court found a likelihood of success on validity based on its grant of summary judgment that assignor estoppel barred both Mentor and Meta from challenging the validity of the '473 patent.

Mentor argues that the district court improperly determined that Mentor was estopped from challenging the validity of the '473 patent. In particular, Mentor asserts that the district court overlooked important factors before applying the doctrine of assignor estoppel. Mentor further argues that the warranty disclaimer in its sales agreement with Quickturn reserved the right to challenge the validity of the '473 patent.

Meta argues that, even if the district court correctly applied estoppel to Mentor, Meta escapes any estoppel because it developed the accused devices well before selling itself to Mentor. Although this court has applied assignor estoppel to parties in privity with the assignor, Meta contests the justification for applying assignor estoppel in this case.

## III

■■■■ Assignor estoppel prevents a party who assigns a patent to another from later challenging the validity of the assigned patent. *See Diamond Scientific v. Ambico, Inc.,* 848 F.2d 1220, 1224, 6 USPQ2d 2028, 2030 (Fed.Cir.1988). This doctrine prevents the "unfairness and injustice" of permitting a party "to sell something and later to assert that what was sold is worthless." *Id.* This court explained that an assignment contains an "implicit representation by the assignor that the patent rights that he is assigning (presumably for value) are not worthless." *Id.*

In applying assignor estoppel in *Diamond Scientific*, this court determined that the Supreme Court's reasons for limiting licensee estoppel in *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), did not apply to assignor estoppel. In *Lear*, the Supreme Court permitted a licensee to contest the validity of the licensed patent:

> Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

*Id.* at 670–71, 89 S.Ct. 1902. As already noted, this court discerned that this logic does not apply to assignors. *Diamond Scientific*, 848 F.2d at 1224. In *Diamond Scientific*, the inventor-assignor left the employ of the assignee and started a competing company. *See id.* at 1222. When his prior employer sued for infringement of the assigned patents, the inventor attempted to assert that the patents were invalid. *See id.* This court explained that, because an assignor "has already been fully paid for the patent rights," the public policy underlying *Lear* did not apply. *Id.* at 1224.

■ Due to the intrinsic unfairness in allowing an assignor to challenge the validity of the patent it assigned, the implicit representation of validity contained in an assignment of a patent for value raises the presumption that an estoppel will apply. Without exceptional circumstances (such as an express reservation by the assignor of the right to challenge the validity of the patent or an express waiver by the assignee of the right to assert assignor estoppel), one who assigns a patent surrenders with that assignment the right to later challenge the validity of the assigned patent. For example, in *Q.G. Products, Inc. v. Shorty, Inc.*, 992 F.2d 1211, 26 USPQ2d 1778 (Fed.Cir.1993), Shorty was formed by three individuals, one of whom assigned a patent ap-

plication to the company in return for a loan and an ownership interest in the company. *See id.* at 1212. When the business associates had a falling out, Shorty assigned the patent back to the inventor in return for the stock, cash, and a promissory note for the remaining loan balance. *See id.* Even though the assignment from Shorty to the inventor merely had the effect of reversing the first assignment, this court estopped Shorty from attacking the patent's validity. *See id.; see also Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1579–81, 27 USPQ2d 1836, 1841–42 (Fed.Cir.1993); *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 836–39, 20 USPQ2d 1161, 1175–77 (Fed.Cir. 1991); *Shamrock Techs., Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 793–96, 14 USPQ2d 1728, 1732 (Fed.Cir.1990); *cf. Diamond Scientific*, 848 F.2d at 1225 (explaining that assignor depends upon examines the balance of the equities between the parties).

■ Because this case does not present sufficient exceptional circumstances to overcome the unfairness to Quickturn without application of the doctrine, the district court properly estopped Mentor from challenging the validity of the '473 patent. Quickturn paid Mentor more than $200,000 in cash and stock for the '473 patent and related applications. While the sales agreement does not allocate the purchase price between the various assets conveyed, Mentor nonetheless received appreciable value for the '473 patent. Now, Mentor seeks to deprive Quickturn of an asset it sold to Quickturn. If Mentor were successful, such a result would be an injustice to Quickturn. Furthermore, Mentor controlled the prosecution of the '473 patent. To the extent that it challenges the validity of the '473 patent due to errors made during prosecution, Mentor should not now profit from its own sloppiness or oversight.

Moreover, in this case, the sales agreement does not reserve to Mentor the right to assert a validity challenge nor does it contain a waiver of Quickturn's ability to assert assignor estoppel. The language in the sales agreement merely allocates the risk that the patent will be declared invalid to Quickturn.

This warranty clause does not alter the background rule that an assignor cannot challenge the validity of the patent it has sold. To overcome the presumption of assignor estoppel, the sales agreement between Mentor and Quickturn would have needed to include express language reserving Mentor's right to assert an invalidity challenge. This general warranty clause, however, could exacerbate the injustice of changing the doctrine of assignor estoppel to permit Mentor to assert invalidity. While the negotiated price reflects the allocation of risk that a third party would succeed in having the '473 patent declared invalid, Mentor's disclaimer might prevent Quickturn from obtaining a refund of its purchase price in the event Mentor successfully asserted invalidity. Such a result would not reflect the reasonable expectations of the parties when they negotiated the sales agreement. The district court properly determined that Mentor is estopped from challenging the validity of the '473 patent.

## IV

Assignor estoppel also prevents parties in privity with an estopped assignor from challenging the validity of the patent. *See Diamond Scientific,* 848 F.2d at 1224. Whether two parties are in privity depends on the nature of their relationship in light of the alleged infringement. "The closer that relationship, the more the equities will favor applying the doctrine" of assignor estoppel. *Shamrock Techs.,* 903 F.2d at 793. Assessing a relationship for privity involves evaluation of all direct and indirect contacts. *See Intel,* 946 F.2d at 838.

In *Shamrock Technologies,* this court found that a company was in privity with an assignor who was both one of its corporate vice presidents and a shareholder. *See* 903 F.2d at 794. The assignor also oversaw the construction and operation of the facilities where the alleged infringement occurred. *See id.* As this court stated, this level of involvement made the assignor "far more than a mere employee" and justified the finding of privity. *Id.*

Similarly, in this case, the district court correctly determined that Meta was in privity with Mentor and properly applied assignor estoppel. Ownership of Meta stock, in and of itself, gives Mentor considerable control over Meta's operations. Even a party that owns less than a majority of a company's stock can still exercise effective control over the company's operations. Mentor owns all of Meta's stock—a reliable indicator of extensive, if not complete, control over Meta's operations.

Mentor, however, is far more than a mere shareholder. The two companies share personnel. Mentor approves Meta's budget. Indeed, Mentor and Meta established their relationship precisely so that Meta would have the capital it needed to manufacture the accused devices and to market them outside of France. Therefore, Meta sold itself to Mentor precisely so that it could undertake the actions that are the cause of the present dispute.

Given Mentor's control over Meta's operations, the district court properly found privity between Mentor and Meta. This relationship deprives Meta of invalidity defenses it would have been able to assert outside this relationship. Due to this privity relationship, it is irrelevant that Meta, after its sale to Mentor, is continuing the business it was in before its sale. A rule setting aside estoppel after a corporate transaction would chart a clear course for assignors to profit from a scheme of slovenly prosecution, marketing of flawed patents, and infringement. The district court correctly found privity and applied the doctrine of assignor estoppel to Meta.

## V

Although Mentor and Meta cannot challenge the validity of the '473 patent, assignor estoppel does not limit their ability to defend themselves in other ways. For example, contrary to the suggestions of Mentor's counsel at argument, assignor estoppel does not preclude the estopped party from arguing that the patentee is itself collaterally estopped from asserting a patent found invalid in a prior proceeding. *See Blonder–Tongue Lab., Inc. v. University of Illinois Found.,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *cf. Foster v. Hallco*

*Mfg. Co.*, 947 F.2d 469, 481–83, 20 USPQ2d 1241, 1250–52 (Fed.Cir.1991) (explaining that *Lear* did not alter the issue preclusive effect of consent decrees). An estopped party may also argue for a narrow claim construction, *see Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 351, 45 S.Ct. 117, 69 L.Ed. 316 (1924), or that the accused devices are within the prior art and therefore cannot infringe, *see Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 257–58, 66 S.Ct. 101, 90 L.Ed. 47 (1945).

## VI

The district court correctly determined that assignor estoppel prevents Mentor and Meta from challenging the validity of the '473 patent. Therefore, the district court did not abuse its discretion in determining that Quickturn had demonstrated a likelihood of success on the merits. Mentor and Meta do not challenge any of the district court's findings with respect to irreparability of harm to Quickturn in the absence of an injunction, the balance of hardships, or the demands of the public interest. Therefore, this court affirms the district court's grant of a preliminary injunction.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*