EARTH RESOURCES CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant,

and

Integrated Environmental Services, Third–Party Defendant.

No. 97–375 C.

United States Court of Federal Claims.

July 12, 1999.

James Gerard Gatto, Washington, DC, counsel of record, for plaintiff.

Paul N. Zolfaghari, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant, with whom were Vito J. DiPietro, Director, and David W. Ogden, Acting Assistant Attorney General, and Thomas J. Byrnes, of counsel.

Stephen M. Schaetzel, Atlanta, GA, for third-party defendant.

## DECISION

DAMICH, Judge.

The Court is called upon to resolve issues surrounding assignor estoppel, a doctrine recognized by the Federal Circuit in *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220 (Fed.Cir.1988). In this action, brought against the United States under 28 U.S.C. § 1498,[1] the Plaintiff, Earth Resources Corp. (ERC), has asserted assignor estoppel against the United States and Integrated Environmental Services (IES), the third-party defendant. For the reasons stated below, the Court holds that assignor estoppel bars IES from contesting the validity of the patents in issue. The United States, however, is not bound and may, therefore, challenge the validity of the patents.

### I. Facts

In 1984, Jeffrey Gold was a co-owner, officer, and employee of ERC. During his employment, Gold claimed to invent a device to puncture gas cylinders. Gold applied for a patent in 1984 on this device. When Gold applied for a patent on this device, Dan Nickens was also a co-owner, officer, and employee of ERC. The original application for a patent listed Gold as the sole[2] inventor.

Gold left ERC on January 19, 1987, and founded IES. Now, he is president and majority stockholder of IES. In April 1987, Gold assigned his interest in the original application to IES.

ERC responded to Gold's departure. In June 1987, a Continuation–in–Part (CIP) Application related to the original application was filed with the Patent and Trademark Office (PTO). The Continuation–in–Part Ap-

---

**1.** This section provides, in pertinent part:

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

28 U.S.C. § 1498.

**2.** Additional facts will show that the parties dispute whether Gold was the sole inventor.

plication listed both Gold and Nickens as inventors. On July 14, 1987, pursuant to 35 U.S.C. § 256, ERC filed a lawsuit against Gold to correct the original application and to list Nickens as an inventor. Gold filed a counterclaim in the lawsuit and asserted that the CIP Application should not have listed Nickens as a co-inventor.

While the lawsuit was pending, on September 1, 1987, the PTO issued United States Patent No. 4,690,180 (the '180 patent), based on the original application. As submitted on the application, Gold was the sole inventor.

The lawsuit settled in August 1988. Gold and IES assigned the original application and the '180 patent to ERC. In a second instrument, Gold and IES assigned the CIP Application to ERC.

On August 8, 1989, ERC filed in the PTO a "Petition for Correction" of the '180 patent under 37 C.F.R. § 1.324[3] to add Nickens as co-inventor. This regulation implements 35 U.S.C. § 256.[4] This Petition for Correction included a declaration from Gold, in which Gold stated that he believed that Nickens was not an inventor. ERC's petition also included a petition under 37 C.F.R. § 1.183[5] to waive the requirement that *all* parties consent to a petition under 37 C.F.R. § 1.324. The PTO denied this petition because Section 256 required the consent of all parties.

On April 2, 1990, ERC filed an Application for Reissue of the Original Patent to correct an error in inventorship. Citing *Ex Parte Scudder*, 169 U.S.P.Q. 814, 1971 WL 16488 (Pat.& Tr.Office Bd.App.1971), ERC argued that "M.P.E.P. [Manual of Patent Examination Procedure] § 1402 allows the use of a reissue application to correct misjoinder of inventors where 35 U.S.C. § 256 is inadequate." Consistent with its duty of candor to the tribunal, ERC represented that the PTO had all facts before it. Specifically, ERC stated that "Mr. Gold's position is represented by his declaration, the transcript of his deposition, and his letter to the Solicitor."

On or about June 19, 1990, the PTO did not accept the Reissue Application because it did not have the written assent of all assignees.[6] On or about February 14, 1991, the

---

3. "Whenever a patent is issued and it appears that the correct inventor or inventors were not named through error without deceptive intention on the part of the actual inventor or inventors, the Commissioner may, on petition of all the parties and the assignees and satisfactory proof of the facts ... or on order of a court before which such matter is called in question, issue a certificate naming only the actual inventor or inventors." 37 C.F.R. § 1.324 (1990).

4. Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly.
35 U.S.C. § 256.

5. "In an extraordinary situation, when justice requires, any requirement of the regulations in this part which is not a requirement of the statutes may be suspended or waived by the Commissioner or the Commissioner's designee, sua sponte, or on petition of the interested party, subject to such other requirements as may be imposed." 37 C.F.R. § 1.183.

6. (a) A reissue oath must be signed and sworn to or declaration made by the inventor or inventors except as otherwise provided (see §§ 1.42, 1.43, 1.47), and must be accompanied by the written consent of all assignees, if any, owning an undivided interest in the patent, but a reissue oath may be made and sworn to or declaration made by the assignee of the entire interest if the application does not seek to enlarge the scope of the claims of the original patent.

(b) A reissue will be granted to the original patentee, his legal representatives or assigns as the interest may appear.
37 C.F.R. 1.172.
Regulation section 1.47 is also relevant to this case:
(a) If a joint inventor refuses to join in an application for patent or cannot be found or reached after diligent effort, the application may be made by the other inventor on behalf of himself or herself and the nonsigning inventor. The oath or declaration in such an application must be accompanied by ... the last known address of the nonsigning inventor. The Patent and Trademark Office shall ...

PTO noted that the claims were rejected, but pending because the application failed to state that the errors in inventorship arose "without any deceptive intention" as required under 37 C.F.R. § 1.175(a)(6). In this same document, the PTO also noted that the reissue application needed to include an offer to surrender the original patent.

ERC's attorney contacted Gold and asked Gold to surrender the original patent. Gold states that this request was his first notice of the reissue application. Gold then filed a petition for consideration of protest (essentially, a motion to consider a late filing) and a protest of the reissue application. Gold asserted, again, that he was the sole inventor listed in the original application and Gold claimed that there was a fraud.

On January 21, 1992, the PTO issued United States Patent Reissue No. 33,799 (Re '799), listing Gold and Nickens as inventors. The policy of the PTO was to *not* investigate an allegation of fraud.[7] As a protestor, Gold could not appeal the decision to issue the patent. *See*, Manual of Patent Examination Procedure (5th Ed.) §§ 1904, 1906. The parties agree that Re '799 is identical to the '180 patent except for the change in inventorship. The claims of Re '799 do not differ, in any way, from the claims of the '180 patent. ERC obtained three additional patents (United States Patent Nos. 5,337,793; 5,499,665; and 5,613,533) that are children of the original patent. These three patents list Gold and Nickens as inventors. These three patents plus Re '799 plus the continuation-in-part patent, which is

United States Patent No. 4,944,333, are the patents in issue in this case.

## Complaint

ERC has five patents that describe "technology associated with processing cylinders and other containers, for example, by using a device such as a Cylinder Recover Vessel." Complaint, ¶ 11. ERC's patents disclose the drilling of a puncture press as a means of puncturing the cylinder. The puncture facilitates the process of testing gases contained in a cylinder.

This lawsuit for infringement of all five patents is against the United States for authorizing IES to infringe patents held by ERC. See 28 U.S.C. § 1498. IES has intervened because it agreed to indemnify the United States. The lawsuit is concerned with actions by the United States in two programs, one operated by the Department of Energy and the other operated by the Army.

## Answers

The United States, in its answer, asserts that the patents are invalid "for failure to comply with one or more of the requirements of 35 U.S.C. §§ 102 (novelty), 103 (nonobviousness), 112 (specification), 116 (inventors), 251 (reissue), particularly in view of the following prior art: [listing of prior art]." In its answer, IES asserts that the patents "are invalid or unenforceable for failure to comply with one or more of the requirements of 35 U.S.C. §§ 102, 103 and/or 112, including: [a general list follows]."

---

forward notice of the filing of the application to the nonsigning inventor at said address and publish notice of the filing of the application in the Official Gazette.
. . .
(b) Whenever all of the inventors refuse to execute an application for patent, or cannot be found or reached after diligent effort, a person to whom an inventor has assigned or agreed in writing to assign the invention or who otherwise shows sufficient proprietary interest in the matter justifying such action may make application for patent on behalf of and as agent for all the inventors. The oath or declaration in such an application must be accompanied by a petition including proof of the pertinent facts, a showing that such action is

necessary to preserve the rights of the parties or to prevent irreparable damage, the fee set forth in § 1.17(i), and the last known address of all of the inventors. The Office shall ... forward notice of the filing of the application to all of the inventors at the addresses stated in the application and publish notice of the filing of the application in the Official Gazette. An inventor may subsequently join in the application on filing an oath or declaration complying with § 1.63.

7. "Protests raising fraud or other inequitable conduct issues will be entered in the application file, generally without comment on those issues." 37 C.F.R. § 1291(b) (1990). See also, Manual of Patent Examination Procedure (5th Ed.) § 1448.

## II. Motion for Partial Summary Judgment

ERC filed a motion for partial summary judgment to prevent the United States and IES from contesting the validity of the patents. A court may decide whether assignor estoppel is applicable in ruling on a motion for partial summary judgment. See *Shamrock Technologies, Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789 (Fed.Cir.1990) (affirming district court's granting of motion for summary judgment).

The motion has four components to it.

1. Should IES be estopped?
2. Does the doctrine of assignor estoppel apply to the government?
3. Is the government in privity with IES?
4. May the government rely on testimony of Jeffrey Gold to present its defenses based on invalidity?

## III. Definition of Assignor Estoppel

■ Assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity. The estoppel also operates to bar other parties in privity with the assignor, such as a corporation founded by the assignor.... The estoppel historically has applied to invalidity challenges based on "novelty, utility, patentable invention, anticipatory matter, and the state of the art." (Citation omitted.) *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir.1988).

"The four most frequently mentioned justifications for applying assignor estoppel are the following: '(1) to prevent unfairness and injustice; (2) to prevent one [from] benefitting from his own wrong; (3) by analogy to estoppel by deed in real estate; and (4) by analogy to a landlord-tenant relationship.' Cooper, Estoppel to Challenge Patent Validity: The Case of Private Good Faith vs. Public Policy, 18 Case W.Res. 1122 (1967). Although each rationale may have some utility depending on the facts presented by the particular case, our concern here is primarily

with the first one." *Id.*, at 1224 (Fed.Cir. 1988).

■ "[W]e believe that the primary consideration in now applying the doctrine is the measure of unfairness and injustice that would be suffered by the assignee if the assignor were allowed to raise defenses of patent invalidity. Our analysis must be concerned mainly with the balance of equities between the parties." Id., 848 F.2d 1220, 1225 (Fed.Cir.1988).

## IV. Should IES be estopped?

ERC sees this case as a textbook case in which assignor estoppel should apply. Because Gold assigned his interest in the original patent and the application that matured into the CIP patent, IES[8] cannot now challenge the validity of those patents. ERC sees no legal authority and no factual circumstance that could lead the court to not apply assignor estoppel against IES.

IES argues that this court should permit IES to fit within an exception to the doctrine of assignor estoppel. Consistent with statements by the Supreme Court and the Federal Circuit, IES contends that inequitable conduct may bar the assertion of assignor estoppel. IES identifies the change in inventorship and errors in the reissue process as inequitable conduct by ERC that should bar ERC from asserting assignor estoppel.

■ Assignor estoppel may have less force when the assignee of the patent rights modifies the patent after assignment. In an early case, the Supreme Court stated:

When the assignment is made before patent, the claims are subject to change by curtailment or enlargement by the PTO with the acquiescence of or at the instance of the assignee, and the extent of the claims to be allowed may ultimately include more than the assignor intended to claim. This difference might justify the view that the range or relevant and competent evidence in fixing the limits of the subsequent estoppel should be more liberal than in the case of an assignment of a granted patent.

8. There is no dispute that IES is in privity with Gold.

*Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 353, 45 S.Ct. 117, 121, 69 L.Ed. 316 (1924).

In a more recent decision, the Federal Circuit has acknowledged a potential exception to the doctrine of assignor estoppel. "[I]n a proper case general principles of equity may preclude use of assignor estoppel to bar a viable equitable defense arising from post-assignment events." *Shamrock Technologies, Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 795 (Fed.Cir.1990). The Federal Circuit, however, has yet to find a "proper case" where the assignee could not assert assignor estoppel.

■ The facts of this case do not present "a proper case." [9] ERC's conduct in changing the inventorship was not inequitable for purposes of assignor estoppel. First, the two assignments by Gold and IES assigned whatever rights each had including rights with regard to "reissue." [10] Therefore, these assignments contemplated that the patents could be reissued.

Second, at the time of the assignment, the parties disputed who was the sole inventor. The assignment, itself, was part of a settlement of a lawsuit in which the *primary* issue was who was the inventor. IES has not presented any evidence that ERC, in settling the lawsuit, lost its rights to seek a change in inventorship on the patent. Therefore, IES should not be surprised that ERC acted to change the inventor.

In this sense, the present case is analogous to *Q.G. Products, Inc. v. Shorty, Inc.*, 992 F.2d 1211 (Fed.Cir.1993). In *Q.G. Products*, a corporation (Shorty), which was controlled by the Lalliers, reassigned an application for a patent to the applicant, Simon, a former owner of Shorty. This assignment was in exchange for consideration. Later, there

was an issue as to whether a Lallier should have been listed as co-inventor with Simon. The Federal Circuit affirmed the decision of the trial court to grant summary judgment on the basis of assignor estoppel and to prevent Shorty from challenging the validity of the patent that matured from the application that Shorty assigned to Simon.

> At the time Shorty reassigned the application to Simon in July 1988, the Lalliers (Shorty) knew that the February 1988 patent application did not list Guy Lallier as an inventor. Nonetheless, Shorty assigned its rights under the application to Simon for value. Thus, they acknowledged the value of the application with full knowledge of the potential issue under section 102(f). For this reason as well, this Court upholds the district court's weighing of the equities and decision to apply the doctrine of assignor estoppel to Shorty.

*Q.G. Products, Inc. v. Shorty, Inc.*, supra, 992 F.2d at 1213.

Like Shorty in *Q.G. Products*, Gold and IES made their assignments with "full knowledge" that inventorship was disputed and did nothing to protect their rights. Compare, *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1378 (Fed.Cir.1998) (recognizing, in dicta, that the assignor may contest the validity of the patent if the assignment contains an "express reservation"). Thus, the equities favor estopping IES from challenging the validity of the patents.

Third, IES has not explained, to this court's satisfaction, how ERC acted inequitably. In its briefs, IES states that for ERC "to qualify for correction under 35 U.S.C. §§ 116 and 256, any error must have arisen 'without deceptive intent.'" Opposition to Motion for Summary Judgment, page 14.

9. The Court notes that although IES's brief focuses on the change in inventorship through the reissue proceeding, IES's answer did not assert an affirmative defense that the patent was invalid because of errors in section 116 or 256 (change in inventorship). Because the United States raises these sections in this answer and because IES could amend its answer, the court will address the merit of IES's argument.

10. The Gold/IES assignment of the original application and patent provides: "[t]his Assignment shall extend to any and all divisional, continuation, continuation-in-part, reissue, extension and substitute patent applications and patents of said Application and Patent ..." Exhibit K, Plaintiff's Memorandum in Support of Motion for Summary. The Gold/IES CIP assignment contains the same language. Exhibit Q, Plaintiff's Reply in Support of Motion for Summary Judgment.

And IES argues that ERC's application for reissue contains deceptions in violation of Section 256.

IES misunderstands ERC's application for reissue. The application for reissue was *not* filed pursuant to Section 256. Instead, ERC states the application is "under 35 U.S.C. § 251 and 37 C.F.R. §§ 1.171–1.179." Reissue Application, Exhibit 2 to IES's opposition, page 1. Moreover, consistent with its duty of candor to the PTO, ERC disclosed that its previous petition for correction was denied because it did not comply with 35 U.S.C. § 256. See, Reissue Application, page 4. In the application for reissue, ERC requested that the patent be reissued under M.P.E.P. § 1402 "where 35 U.S.C. § 256 is inadequate." Reissue Application, page 5. In short, Section 256 was not used in the application for reissue. Therefore, IES's protests that ERC did not comply with that section are irrelevant.[11]

Fourth, IES has not demonstrated that the listing of Nickens and Gold as joint inventors prejudices IES in any way. This lack of prejudice distinguishes the present case from the situation described in *Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 353, 45 S.Ct. 117, 121, 69 L.Ed. 316 (1924). There, the Supreme Court seemed concerned that an assignee may enlarge the scope of the patent application and thereby, unfairly, force the assignor to transfer more than the assignor had intended. An addition of one inventor is not the same as the situation of concern in *Westinghouse.*

Accordingly, this Court rules that IES is estopped from contesting the validity of the patents.

The Court next turns to the issue of whether assignor estoppel applies to the United States. This issue raises two analytically distinct questions: first, is assignor estoppel ever applicable to the United States and second, is the United States in privity with IES?

11. The Court is *not* ruling that the PTO had the legal authority to reissue a patent with a changed inventor when the applicant for reissue could not comply with Section 256. The Court also is *not* ruling that Nickens was entitled to be listed as a

## V. Is assignor estoppel ever applicable to the United States?

The government presents two arguments for why assignor estoppel should not be applied against the United States. First, the government has not waived its right to contest the validity of patents under its general waiver of sovereign immunity in Section 1498. Second, the government is a licensee and a licensee may challenge the validity of a patent that it has licensed. Both arguments are unpersuasive.

### A. Does the doctrine of assignor estoppel implicate the doctrine of sovereign immunity?

The government begins its argument by noting that the government's liability depends on the extent of sovereign immunity. "Thus, the jurisdiction of the Court of Federal Claims is prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed.Cir.1998). According to the government, the doctrine of assignor estoppel is inconsistent with the government's waiver of sovereign immunity in 28 U.S.C. § 1498, the statute that authorizes lawsuits against the federal government for patent infringement.

The government argues that it is not the same as a private defendant in a patent lawsuit. The government quotes the following language:

> As occurs frequently in section 1498 patent actions, the parties in the instant appeal are presenting and arguing the case as if it were an action brought under Title 35. Although concepts, phrases and words commonly used in the patent field may connote or denote a panoply of rights and remedies under Title 35, the same concepts, phrases and words do not and cannot always connote or denote the same meaning under section 1498. Although a section 1498 action may be similar to Title

co-inventor. Both of these issues are beyond the scope of this opinion, which is whether IES is estopped from challenging the validity of the patents it assigned.

35 action, it is nonetheless only parallel and not identical.

*Motorola, Inc. v. United States,* 729 F.2d 765, 768 (Fed.Cir.1984).

The government, therefore, contends that because it is not a private party, the doctrine of assignor estoppel does not apply to it. The government's argument ultimately fails because the government ignores the legislative history of Section 1498, which shows that "assignor estoppel" is consistent with "sovereign immunity."

In *Motorola* and *Pratt & Whitney Canada, Inc. v. United States,* 12 Cl.Ct. 221 (1987), the Federal Circuit and the Claims Court considered what defenses were available to the government in a Section 1498 proceeding. These cases are instructive on whether the defense of invalidity is available to the government. Because of their prominence as the only precedent on this issue, a detailed examination of both *Motorola* and *Pratt & Whitney Canada* is appropriate.

In *Motorola,* the question was whether the United States may assert 35 U.S.C. § 287 in defending an action against it under Section 1498. Section 287 restricts damages in a patent case when the patentee failed to label or to mark that its product was patented. The United States asserted Section 287. as a defense. The Federal Circuit determined that the United States could not assert 35 U.S.C. § 287.

In deciding the case, *Motorola* set forth the history of Section 1498:

The original statute, enacted on June 25, 1910, ch. 423, 36 Stat. 851 (the "1910 statute" or "1910 Act"), includes the following proviso:

Provided further, That in any such suit the United States may avail itself of any and all defenses, general or special, which might be pleaded by a defendant in an action for infringement, as set forth in Title Sixty of the Revised Statutes, or otherwise: [Emphasis in original.]

*Motorola, Inc. v. United States,* supra, 729 F.2d at 769 (footnote omitted). The 1910 statute was initially codified in 35 U.S.C. § 68 and was subsequently removed and re-codified as 28 U.S.C. § 1498 in 1948. Id., n. 5.

In 1948, the 1910 statute was changed. The Federal Circuit quotes the Reviser's Note:

Provisions contained in the second proviso of said section 68, relating to right of the United States to any general or special defense available to defendants in patent infringement suits, were omitted as unnecessary. In the absence of statutory restriction, any defense available to a private party is equally available to the United States.

Changes in phraseology were made.

*Id.,* at 769.

The Federal Circuit then examined whether Congress considered the legislative predecessor to Section 287 as a defense to an infringement action when Congress enacted the 1910 statute. *Id.,* at 771. Ultimately, the Federal Circuit ruled that Section 287 was not available to the government as a defense in an action brought under Section 1498. *Id.,* at 772. *Motorola* effectively places the United States in a position worse than a defendant that is a private party because a private defendant would have the advantage of Section 287.

In *Pratt & Whitney,* the Claims Court held that Section 1498 permitted the government to assert the defense of laches, because laches is a recognized affirmative defense under 35 U.S.C. § 282. The Claims Court examined the plain language of Section 1498 and also the legislative history of it. In reaching this decision, the Claims Court distinguished Section 287, which was involved in *Motorola.*

The Claims Court recognized that the United States was gaining an advantage when compared to the Plaintiff. "[I]t should be noted that the balance of equitable remedies and equitable defenses in this court may not be completely symmetrical." *Pratt & Whitney Canada, Inc. v. United States,* 12 Cl.Ct. 221, 222 (1987). In waiving sovereign immunity, the government "has allowed itself all the defenses available to a private party, even though the plaintiff cannot avail itself of all the remedies available to a private party. Although this is indeed an asymmetrical situ-

ation, that does not render it unjust. But it should be further noted that a determination as to the wisdom of a statute is not the function of the court." *Id.*, at 222–23.

This Court adopts the framework from *Motorola* and *Pratt & Whitney Canada*. Pursuant to this structure, the Court will analyze (1) the history of assignor estoppel and (2) the legislative history of Section 1498.

### 1. History of Assignor Estoppel

According to the Supreme Court, the principle of assignor estoppel has been applied to patent cases "as early as 1880 in *Faulks v. Kamp*, 3 F. 898, and were followed by a myriad.... There are later cases in nearly all the Circuit Courts of Appeal to the same point." *Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 349, 45 S.Ct. 117, 119–20, 69 L.Ed. 316 (1924). Before 1910, approximately thirty cases—including eleven by federal appeals courts—discuss assignor estoppel. Therefore, assignor estoppel had existed for some time before 1910, the date of enactment of Section 1498.

### 2. Legislative History of Section 1498

The legislative history of Section 1498 on this issue is very sparse. The debate mostly focused on whether the United States should consent to be sued for patent infringement at all.

Three speakers discussed the relationship between a plaintiff and defendant. One advocate for the bill stated: a patentee "ought to have the same latitude to sue the Government as he has to sue ... any other citizen of the country, for infringing a patent. I think there ought to be no distinction." 45 Cong. Rec. 8771–72 (1910). Another supporter stated: "[there is] nothing in [this bill] at all in relation to pleadings or procedure. It will be answered that the Government may plead such defenses as may be pleaded under Title LX of the Revised Statutes of the United States in an action for infringement of a patent, but that is the only character of the pleading that is referred to in the bill.... The method or manner of pleading defenses is not provided for in the bill." 45 Cong.Rec. 8775 (1910).

### 3. Analysis

■ Congress did not exempt the government from the doctrine of assignor estoppel. Congress is presumed to know the existing state of the law when it enacts a statute. See, *Fluor Corp. v. United States*, 126 F.3d 1397, 1404, *reh'g granted*, 132 F.3d 700 (Fed. Cir.1997), *cert. denied*, 522 U.S. 1118, 118 S.Ct. 1057, 140 L.Ed.2d 119 (1998); *Bristol–Myers Squibb Co. v. Royce Lab., Inc.*, 69 F.3d 1130, 1136–37 (Fed.Cir.1995). Therefore, Congress knew that assignor estoppel existed in 1910. Although Congress eliminated some equitable remedies, such as an injunction, Congress did not remove assignor estoppel as a way of defeating the government's defenses.

■ The doctrine of assignor estoppel is consistent with the express language of Section 1498. The predecessor to Section 1498 explicitly authorizes the government to "avail itself of any and all defenses, general or special, that might be pleaded by a defendant in an action for infringement." 35 U.S.C. § 68 (1940) (amended and recodified by ch. 646, § 1498, 62 Stat. 869). Here, the government has raised several defenses, such as anticipation and novelty. The Plaintiff has merely countered those defenses. Section 1498 does not restrict the way in which the Plaintiff may overcome whatever defenses the government raises.

The legislative history also favors applying assignor estoppel against the government. As discussed above, one supporter said a plaintiff should have the "same latitude" against the government as "any other defendant." Here, if the government were a private party, the plaintiff certainly could assert assignor estoppel against it.

This conclusion is consistent with *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 345, 48 S.Ct. 194, 197, 72 L.Ed. 303 (1928). See also, *Hughes Aircraft Co. v. United States*, 29 Fed.Cl. 197, 223–24 n. 30 (1993) (stating "courts should not lightly conclude that Congress intended to deprive patentees of effective recourse for infringement simply because the infringer was the government or a party working for the government."). In *Richmond Screw*, the Supreme

Court interpreted an amendment to the 1910 Act, which was made in 1918. The 1918 Act eliminated a patent owner's right to sue an entity that manufactured allegedly infringing goods for the United States. Under the 1918 Act, the patent owner's *exclusive* remedy was to sue the United States. The Supreme Court "must presume that Congress in the passage of the Act of 1918 intended to secure to the owner of the patent the exact equivalent of what it was taking away from him. It was taking away his assignable claims against the contractor for the latter's infringement of his patent." *Id.*, 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303. Since the patent owner prior to 1918 could have brought an action against a private contractor and had the right to assert assignor estoppel against this defendant, the 1918 Act had the effect of maintaining the patent owner's right to assert assignor estoppel but transferring the liability to the United States.[12]

Accordingly, sovereign immunity and 28 U.S.C. § 1498 do not prevent the assertion of assignor estoppel against the government. The government raises a second, policy-based argument that the doctrine of assignor estoppel should not apply to it.

**B. Is the United States a licensee, so that assignor estoppel does not apply to it?**

■ The United States argues that, analogous to eminent domain, when the government takes a patent it is a "compulsory, nonexclusive licensee." *Motorola v. United States,* supra, 729 F.2d at 768. The Supreme Court ruled that a licensee has the right to challenge the validity of a patent. *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). According to the United States since it is effectively a licensee and a licensee can challenge the validity of the patent, the United States can challenge the validity of this patent.

ERC challenges this syllogism. ERC points out that an action against the government for infringing a patent is like an action

against the government for taking a property by eminent domain. *Crozier v. Fried Krupp Aktiengesellschaft,* 224 U.S. 290, 32 S.Ct. 488, 56 L.Ed. 771 (1912). When the government uses its eminent domain power, the government takes property subject to all the conditions as they exist at the time of the taking. *A.W. Duckett & Co. v. United States,* 266 U.S. 149, 151, 45 S.Ct. 38, 69 L.Ed. 216 (1924); *United States v. 70.39 Acres of Land,* 164 F.Supp. 451, 470–71 (S.D.Cal.1958). ERC completes this analogy by claiming that the United States has "property through a contract, the Government also takes with that contract all of the limitations on that property that the contractor provides."

As a second attack, ERC cites *Acoustical Design, Inc. v. Control Electronics Co.,* 932 F.2d 939, 942–43 (Fed.Cir.1991). "We consider an assignor-licensee to be in a different situation from an ordinary licensee and view *Diamond Scientific* to be applicable even when there is a subsequent license back to the assignor."

The Court agrees with ERC's second argument and, therefore, offers no comment on the first argument. In *Acoustical Design,* the Federal Circuit determined to treat assignor-licensees like assignors, not like licensees, for purposes of estoppel. Thus, if the government is in privity with IES, the government would be an assignor-licensee and subject to the doctrine of assignor estoppel.

Having addressed the government's policy arguments that assignor estoppel should never apply to it, the Court must resolve whether the United States is in privity with IES.

**VI. Is the government in privity with IES?**

Because the doctrine of assignor estoppel may be applied against the government, the next question is whether the government is in privity with IES. Assignor estoppel extends to not only the person who assigned the patent but also an entity in privity with the assignor.

12. Even if the United States is vulnerable to assignor estoppel, assignor estoppel will actually prevent the United States from attacking the validity of the patents *only* when the United States is in privity with the inventor. Whether the United States is in privity with IES is discussed in part VI, below.

## A. Standards for Deciding Privity

"What constitutes 'privity' varies depending on the purpose for which privity is asserted." *Shamrock Technologies, Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 793 (Fed.Cir.1990). "Privity, like the doctrine of assignor estoppel itself, is determined upon a balance of the equities.... The closer that relationship [between an inventor and the other entity], the more the equities will favor applying the doctrine." *Id.*

## B. Summary of Parties' Arguments

The Plaintiff points to three facts that support a finding of privity: (1) the government authorized the infringement in the two contracts with IES; (2) the government agreed to indemnify IES for any infringement; and (3) the government took advantage of the knowledge of Gold and IES. The Plaintiff cites *Intel Corp. v. United States Int'l Trade Comm.*, 946 F.2d 821, 838 (Fed. Cir.1991); *Shamrock Technologies, Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 793 (Fed.Cir.1990); and *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374 (Fed.Cir.1998) in support of its position.

The factual basis for the Plaintiff's claim of privity is not disputed. As noted above, the Plaintiff has identified three separate reasons for finding that the government is in privity with IES. Under the two contracts, the government "authorizes and consents to all use and manufacture, in performing the order of any subcontract at any tier, of any invention described in and covered by a United States patent." Los Alamos Contract, Article A29, attached as Exhibit O to Plaintiff's memorandum. See also, FAR § 52.227–1,[13] which is incorporated into the Army contract. Subcontract agreement, attached as Exhibit P to Plaintiff's memorandum.

The Plaintiff points to the agreement to indemnify as another basis for finding privity. Quoting *Intel Corp. v. United States Int'l Trade Comm.*, 946 F.2d 821, 839 (Fed. Cir.1991), the Plaintiff argues that an indemnification agreement, by itself, is enough to establish privity. Further, the connection between the indemnification and Section 1498 "intertwines" the government and IES in that although the government has authorized the infringement, IES may ultimately be required to pay any judgment. According to the Plaintiff, it would be inequitable to allow IES's partner to assert the invalidity of the patents when IES cannot.

The Plaintiff's last argument is that the government used the inventor's "knowledge and assistance" to conduct the infringement. The government and IES admit that the government relied on Gold to participate in designing the Los Alamos Device and the MMD–1. According to the Plaintiff, *Intel* also establishes a rule that when the infringer relies on the assignor's knowledge, the infringer is in privity with the assignor.

The United States and IES both argue that the facts do not support a finding of privity. They further attempt to distinguish the three cases on which the Plaintiff relies.

## C. Federal Circuit Decisions on Privity in the Context of Assignor Estoppel

In determining whether the United States is in privity with IES, decisions of the Federal Circuit show examples of what the Federal Circuit understands as privity in the context of assignor estoppel. The Court, therefore, addresses the three cases identified by the parties.

### *Mentor Graphics Corp. v. Quickturn Design Systems, Inc.*, 150 F.3d 1374 (Fed.Cir. 1998)

In *Mentor*, the Federal Circuit affirmed a district court decision that granted partial

---

**13.** This provision provides:
The Government authorizes and consents to all use and manufacture, ... of any invention described in and covered by a United States patent (1) embodied in the structure or composition of any article, the delivery of which is accepted by the University for the Government under the order, or (2) used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor.... The

entire liability to the Government for infringement of a patent of the United States shall be determined solely by the provisions of the indemnity clause, if any, included in this contract .... and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.

48 C.F.R. § 52.227–1.

summary judgment to the patent holder. The Federal Circuit held that the district court correctly found privity between the inventor and the alleged infringer.

The factual history is as follows: The inventors assigned their patent to their employer, Mentor. Mentor sold the patent to Quickturn. Mentor purchased Meta, a French corporation, that was in the same business as Mentor and Quickturn. In a counterclaim, Quickturn alleged that products produced by Mentor and Meta infringed its patents. Quickturn filed a motion for partial summary judgment to preclude Mentor and Meta from challenging the validity of the patents. The district court's decision to grant the motion was affirmed.

After determining that Mentor was estopped from attacking the patent's validity, the district court found that Meta was in privity with Mentor. For this decision, the Federal Circuit relied on the following facts: "Mentor owns all of Meta's stock—a reliable indicator of extensive, if not complete, control over Meta's operations. . . . The two companies share personnel. Mentor approves Meta's budget. Indeed Mentor and Meta established their relationship precisely so that Meta would have the capital it needed to manufacture the accused devices to market them outside of France. Therefore, Meta sold itself to Mentor precisely so that it could undertake the actions that are the cause of the present dispute." *Id.*, at 1379.

**Intel Corp. v. United States Int'l Trade Comm., 946 F.2d 821 (Fed.Cir.1991)**

In *Intel Corp. v. United States Int'l Trade Comm.*, 946 F.2d 821 (Fed.Cir.1991), the Federal Circuit affirmed in part, reversed in part, and vacated in part a decision by the United States International Trade Commission [Commission]. The decision was after a hearing on the merits. The Federal Circuit vacated the part of the decision relating to assignor estoppel.

In the lower proceeding, the Commission found that one party, GI/M, was not in privity with George Perlegos, one of the inventors. Perlegos was a major shareholder and chief executive officer at Atmel.[14]

The Federal Circuit ruled that the Commission "did not adequately consider the part George Perlegos played in creating the joint venture between GI/M and Atmel, under which the two corporations sought to mutually develop EPROM designs and processes." *Id.*, at 838. The Federal Circuit noted the following arrangements: (1) Perlegos was in charge of Atmel's business and finances; (2) Perlegos personally indemnified GI/M against patent infringement suits; and (3) GI/M would not have proceeded without the indemnification. Based upon these facts, "it is apparent that GI/M's dealings with Atmel are also, in substance, dealings with George Perlegos."

The Federal Circuit also reviewed other connections. Atmel transferred its designs to GI/M. Perlegos personally selected the factory that would produce the infringing product for GI/M. In addition, GI/M controlled some of Atmel's stock and GI/M provided almost all or all the funding for Atmel.

While analyzing these facts, the Federal Circuit made statements that the parties have quoted in the briefs. "What is significant is whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct the infringement." *Id.*, at 839. "Such an indemnification agreement, in other cases, has alone been enough to find privity. See *Urbain v. Knapp Bros. Mfg. Co.*, 217 F.2d 810 (6th Cir.1954); *Weyerhaeuser Timber Co. v. Bostitch, Inc.*, 178 F.Supp. 757, 760–61 (D.R.I.1959)." *Id.*, at 839.

The Federal Circuit concluded:

"In view of (1) Atmel's direct transfer of technology to GI/M, (2) George Perlegos' continuous involvement in the joint development program, (3) George Perlegos' (and his brother's) financial indemnification of GI/M, and (4) GI/M's financial involvement in Atmel and the joint development program, we must conclude that the balance of the equities requires a finding of privity between GI/M and George Perlegos." *Id.*, at 839.

---

**14.** The Commission determined that Atmel was in privity with Perlegos. Atmel did not challenge this finding. See, *Id.*, at 837 n. 23.

*Shamrock Technologies, Inc. v. Medical Sterilization, Inc.,* 903 F.2d 789, 794, (Fed. Cir.1990).

In *Shamrock,* the Federal Circuit affirmed a district court decision that granted a partial summary judgment to the patent holder. The Federal Circuit held that the district court correctly struck the affirmative defenses relating to infringement because of assignor estoppel.

The Federal Circuit relied on the following facts: "(1) in July 1983 Luniewski [the inventor] left Shamrock to join MSI as Vice-President in charge of operations; (2) Luniewski owns 50,000 shares of MSI stock; (3) MSI was formed in 1982 to sterilize surgical instruments and manufacture other medical goods; yet as soon as Luniewski was hired in 1983, MSI built facilities for [using the patented technology]; (4) Luniewski oversaw the design and construction of those facilities; (5) Luniewski was hired in part to start up MSI's infringing operations; (6) the decision to begin [using the patented technology] was made jointly by Luniewski and the president of MSI; (7) MSI began manufacturing [the patented device] in 1985; and (8) Luniewski was in charge of MSI's [infringing] operations." *Id.,* at 794. The Federal Circuit determined MSI "clearly availed itself of Luniewski's 'knowledge and assistance' to conduct infringement."

### D. Analysis

The government is not in privity with IES. *Mentor, Intel,* and *Shamrock* involve very close financial relationships in which the actual assignor almost envelopes the other entity. Here, the relationship between the government and IES has greater separation.

■ IES and the government have financial independence. The foundation for the relationship is a pair of contracts. A contractual relationship, alone, is not enough to establish privity in the context of assignor estoppel. Federal Circuit precedents indicate that a degree of financial interconnectedness is significant to determining whether there is privity. The Plaintiff, however, has not presented evidence that the government had financial control over IES. For example, there is no evidence that the government funds a significant portion of IES's business.[15] Without a showing that the government has significant influence or control over IES, a finding of privity becomes more difficult.

■ The Plaintiff urges the court to find essentially that the contracts contain the "close relationship" on which privity is based. For example, according to the Plaintiff's interpretation of *Intel,* indemnification alone can justify a finding of privity. The language on which the Plaintiff relies, however, is dicta because the Federal Court relied on many facts, not just the indemnification, to find privity.[16] While indemnification is some evidence of privity, indemnification alone does not mandate a finding of privity.

■ The Plaintiff also argues that the government's use of Gold/IES shows privity because the government availed itself of IES's "knowledge and assistance." The Plaintiff contends that because the government relied entirely on IES to design the allegedly infringing products, the facts present a stronger case for privity. This argument is flawed because it overlooks the government's role. If taken to its logical end, the Plaintiff's argument is that the government could avoid a finding of privity if the

---

**15.** The evidence presented suggests the opposite. For example, IES made only the initial design for the MMD–1 device. See United States Army's Response to Interrogatory 15, submitted as Exhibit K to Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment. Despite the end of its relationship for this project, IES has continued in business. This fact implies that IES has sources of revenue other than the government.

**16.** Moreover, *Urbain v. Knapp Bros. Mfg. Co.,* supra, 217 F.2d 810, is a weak precedent. The

dissent points out the paucity of the factual basis for privity. "Since the defendants in the two cases are different, the ruling necessarily rests upon the fact[ ] ... that there is a privity of interests between the defendants in the respective cases. The majority opinion recognizes the necessity of these facts. But there are no findings of fact to that effect by the District Judge, and, in my opinion, the record before us does not warrant us in assuming that [privity existed]." *Id.* at 817 (dissenting opinion).

government began to develop its own technology. Then, the government could seek the assistance of Gold/IES to supplement its already existing project. This arrangement would be needlessly costly. Instead of sinking the public's resources to discover what has already been learned, the government may consult from the beginning with the inventors.

When these factors are considered separately and together, the Plaintiff has not shown that a close relationship between the government and IES exists. The government is not in privity with IES. Therefore, the government may assert that the Plaintiff's patents are invalid.

### VII. May the government present testimony from Gold on the patent's invalidity?

■ The Plaintiff raises an additional issue for the court to resolve: May the government present testimony of any representative of IES, especially Jeffrey Gold, about the validity of the ERC patents?

According to the Plaintiff, an inventor, who has made an assignment for value, may not testify as to the patent's validity even in a proceeding against a Defendant with whom the inventor is not in privity. The Plaintiff cites *Total Containment Inc. v. Buffalo Environmental Products Corp.*, 35 U.S.P.Q.2d 1385, 1394, 1995 WL 454143 (E.D.Va.1995); *Henkel Corp. v. Coral Inc.*, 754 F.Supp. 1280, 1318 (N.D.Ill.), aff'd 945 F.2d 416, 1991 WL 172643 (Fed.Cir.1991) (table). In particular, the Plaintiff quotes *Henkel* as stating "[t]he opinions of the inventor, Mr. Binns, who is now an employee of the infringer Coral, as to the validity of the '661 patent claims should not be accorded any weight. Under the doctrine of assignor estoppel, Mr. Binns is estopped from challenging the validity of the '661 patent."

The Court disagrees with the Plaintiff's interpretation of *Henkel* and *Total Containment*. Although *Henkel* states that the inventor's testimony "should not be accorded any weight," it is apparent that the inventor actually did testify. The court, apparently, found his testimony to be worthless. Therefore, *Henkel* does not establish an absolute rule that assignor estoppel bars an inventor from testifying on the validity of the patents.

The facts in *Total Containment* also point to the same result. The opinion appears to be a decision after a trial in which the Defendant asserted several affirmative defenses. These defenses included collateral estoppel, a challenge to the Plaintiff's earlier filing date, inequitable conduct by the Plaintiff before the PTO, on sale bar and/or public use, abandonment of patents, and anticipation. *Total Containment Inc. v. Buffalo Environmental Products Corp.*, supra, 35 U.S.P.Q.2d at 1390–94. The opinion notes that the Defendant offered "the oral testimony of Mr. Webb [the inventor] to support their contention that patents were intentionally abandoned," but rejects this affirmative defense as unproven. The opinion does not indicate that Webb testified as to any other defense. In a section captioned "Assignor Estoppel," the decision states "that the defendant is estopped from contesting the validity of the patents through the testimony of Mr. Webb." Id., 1394. The opinion, however, does not explain how the Defendant wanted to use Webb's testimony to challenge the "validity" other than in conjunction with the issue of abandonment. In that regard, the Court permitted Webb to testify. The fact the Court rejected this testimony has little import because the issue is whether the inventor may testify at all.

Consistent with both *Henkel* and *Total Containment*, the Court declines to adopt an *absolute* bar. Instead, the Court anticipates [17] a more flexible approach that per-

---

17. The Court notes that as part of its motion for partial summary judgment, the Plaintiff has raised this issue specifically. The Court, accordingly, rules on the question.

The Court, however, questions whether this issue should have been raised *at this time*. In seeking to bar testimony, the Plaintiff could be considered to have filed a motion in limine, although a trial date has not even been set. In

filing the motion, the Plaintiff probably believed that a favorable answer on this question would obviate discovery from IES and Jeffrey Gold and thus would save time and expense. While this goal is laudable, the Court cannot bar this testimony without knowing more precisely what the testimony will be.

Furthermore, the Court is reluctant, so far from trial, to exclude potentially relevant testi-

mits an inventor, who has assigned the patent for value, to testify as to the patent's validity. Accordingly, Gold and other representatives of IES may testify as to the validity of the patents in issue. The weight of such testimony, if any, can only be determined after trial.

The Court notes that the trial testimony of an inventor is sometimes scrutinized with rigor. See, e.g., *Senmed, Inc. v. Richard–Allan Medical Indus. Inc.*, 888 F.2d 815, 819 n. 8 (Fed.Cir.1989) (stating "Where meaning of claim term is clear from specification and prosecution history, the inventor's 'self-serving post-hoc opinion testimony on the legal question whether it should have a different meaning was of little if any significance.' ") This approach may be appropriate in this case, but the Court will not make this evaluation without first hearing the testimony.

## VIII. CONCLUSION

The motion for partial summary judgment against IES is granted. The motion for partial summary judgment against the United States is denied. Furthermore, the United States may present testimony from Jeffrey Gold or other representatives from IES. The parties should be prepared to discuss a scheduling plan at the next status conference.

mony. Gold's testimony *may* be especially important concerning the events after his assignment. The inventor's oath, to which Gold attested, distinguishes some affirmative defenses, such as novelty and obviousness, from other affirmative defenses, such as errors in the reissue process and inventorship.